**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CEDRIC TAYLOR on behalf of himself, all others similarly situated, and on behalf of the general public,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED ROAD SERVICES, INC., and DOES 1-100,**<br><br>**Defendants.** | **1:18-cv-00330-LJO-JLT**<br><br>**MEMORANDUM DECISION AND ORDER RE PLAINTIFF'S MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES TO PLAINTIFF**<br><br>**(ECF No. 12)** |

## I. INTRODUCTION

Before the Court is Plaintiff Cedric Taylor's motion to remand and for an order awarding attorneys' fees and costs. On March 7, 2018, Defendant United Road Services ("URS") removed the case to this Court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), which provides that district courts have original jurisdiction over class actions comprising 100 or more class members in which the amount in controversy exceeds $5 million and there is minimal diversity between plaintiffs and defendants. ECF No. 1. On April 6, 2018, Plaintiff moved to remand the case to state court. ECF No. 12 ("Motion"). Defendant opposed, ECF No. 13 ("Opp."), and Plaintiff filed a reply, ECF No. 14 ("Reply"). This matter is suitable for disposition without oral argument. *See* Local Rule 230(g). For the reasons set forth below, Plaintiff's motion to remand is GRANTED.

## II. FACTUAL BACKGROUND

This is a wage-and-hour class action arising out of Plaintiff's purported employment with URS.

On February 1, 2017, Plaintiff filed a complaint in the Superior Court of California, County of Kern. That complaint defined the putative class to be "All persons who are employed or have been employed by Defendants in the State of California as hourly, Non-Exempt truck workers, industrial truck workers, industrial truck drivers, industrial vehicle drivers, industrial workers, and/or other similar job designations and titles during the period of the relevant statute of limitations." ECF No. 1-1 at PDF page 14 ¶ 41. Defendant filed its answer on June 6, 2017. ECF No. 1-1 at PDF page 71. Pending at the time that Plaintiff filed his case was *Brent Hooper, et al. v. URS Midwest, Inc. d/b/a United Road Services, Inc.*, Lead Case No. CIVDS1607489, Superior Court for the State of California, County of San Bernardino ("*Hooper* action"). On July 10, 2017, the court granted final approval of the class settlement in *Hooper*. ECF No. 1-1 at 83. The settlement class was defined to be "All individuals who were employed by [URS] in the position of California-domiciled Car Hauler employee in any pay period during the . . . period from May 13, 2012 through January 30, 2017." *Id*.

Plaintiff served discovery in mid-June, including requests for production of documents, interrogatories, and deposition notices. ECF No. 12-1, Declaration of Tony Roberts ("Roberts Decl.") ¶ 3. Defendant resisted, arguing that Plaintiff and the putative class were not employees of Defendant and that their claims were covered by the class settlement in *Hooper*. It was at this time, in mid-July, that Plaintiff first learned of the *Hooper* action. Because Defendant did not consider him to be an employee, he did not receive notice or opt-out rights. *Id*. ¶ 8.

Counsel for Plaintiff and Defendant engaged in a number of communications that Plaintiff now claims served to put Defendant on notice of the class that Plaintiff sought to represent. First, Plaintiff sent a letter to Defendant on August 21, 2017, clarifying that the putative class was not part of the *Hooper* settlement: "In other words, Mr. Taylor and the class of similarly situated persons were not part of the Hooper settlement because Defendant did not classify them as 'employees' and, therefore, [they] are entitled to pursue their claims under this lawsuit." *Id*. ¶ 10. Second, Defendant sent a letter on September 27, 2017, to Plaintiff, stating in part that it was Defendant's "understanding that Plaintiff

believes that 'similarly situated' persons are individuals based in California who, while not a party to an IC Agreement, provided driver services to Fleet Owners." ECF No. 12-3. Third, Plaintiff sent an email to Defendant on October 10, 2017, requesting that Defendant "please send me a ballpark estimate of the class size (for all California based drivers of Fleet Owners)." ECF No. 12-4 at 5. Fourth, Plaintiff cites his response to Special Interrogatory No. 1, dated November 1, 2017, which stated Plaintiff's position that "he and other 'drivers of Fleet owners'" were non-exempt employees, contrary to Defendant's classification. ECF No. 12-5 at 4. Fifth is an email dated November 3, 2017, from Defendant to Plaintiff, in which Defendant stated that it was not in possession of any policies or procedures for "drivers of fleet owners that we have been discussing." *Id.* at 2.

On November 6, 2017, Defendant moved for judgment on the pleadings, arguing that Plaintiff's claims were covered by the *Hooper* settlement. The court granted Defendant's motion on December 5, 2017, and permitted Plaintiff to file an amended complaint, which he did on February 5, 2018. He seeks to represent a class of drivers who were not directly employed by URS but drove for third-party entities that made pickups or deliveries for URS customers, defined as follows:

> All persons who are employed or have been employed by Defendant in the State of California as all non-exempt drivers, car-haulers, fleet drivers, co-drivers or similar job designations who did not contract directly with but were dispatched by UNITED ROAD SERVICES, INC. to perform pickup and delivery services for customers of UNITED ROAD SERVICES, INC. or any related entity during the time period of February 1, 2013, to the present (hereinafter referred to as "Non-Exempt Employees"). This class of individuals does not include those drivers who received notice and opt-out rights in the class action settlement of Br*ent Hooper, et al. v. URS Midwest, Inc. d/b/a United Road Services, Inc* (*Hooper*) Lead Case No. CIVDS1607489, consolidated with Case Nos. CIVDS1609866, 1612011, 1614514, filed in the Superior Court for the State of California for the County of San Bernardino; this class of car-haulers does not include drivers who have an ownership interest in an entity that signed, an "Independent Contractor Service Agreement" or similar written contract with UNITED ROAD SERVICES, INC. or any related entity.

Amended Complaint ¶ 61. Defendant removed the case on March 7, 2018.

### III. LEGAL STANDARD

"[A]ny civil action brought in a State court of which the district courts of the United States have

1   original jurisdiction, may be removed by the defendant or the defendants, to the district court of the

2   United States for the district and division embracing the place where such action is pending." 28 U.S.C.

3   § 1441(a). "To remove a case from state court to federal court, a defendant must file in the federal

4   forum a notice of removal 'containing a short and plain statement of the grounds for removal.'" *Dart*

5   *Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 551 (2014) (quoting 28 U.S.C. §

6   1446(a)). However, "[i]f at any time before final judgment it appears that the district court lacks subject

7   matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

8           CAFA vests federal courts with "jurisdiction over certain class actions, defined in § 1332(d)(1),

9   if the class has more than 100 members, the parties are minimally diverse, and the amount in

10  controversy exceeds $5 million." *Dart*, 135 S. Ct. at 551 (quoting § 1332(d)(2), (5)(B)). "[U]nder

11  CAFA[,] the burden of establishing removal jurisdiction remains, as before, on the proponent of federal

12  jurisdiction." *Abrego Abrego v. The Dow Chem. Co.,* 443 F.3d 676, 685 (9th Cir. 2006) (per curiam).

13  "If the plaintiff's complaint, filed in state court, demands monetary relief of a stated sum, that sum, if

14  asserted in good faith, is 'deemed to be the amount in controversy.'" *Dart*, 135 S.Ct. at 551 (quoting

15  28 U.S.C. § 1446(c)(2)). "When plaintiff's complaint does not state the amount in controversy, the

16  defendant's notice of removal may do so." *Id.* (quoting 28 U.S.C. §1446(c)(2)(A)); *see also Abrego*,

17  443 F.3d at 683.

18          Under CAFA, there is no presumption against removal. *Id.* at 554. "Where facts are in dispute,

19  the statute requires district courts to make factual findings before granting a motion to remand a matter

20  to state court." *Mondragon v. Capital One Auto Fin.,* 736 F.3d 880, 883 (9th Cir. 2013). On a

21  plaintiff's motion to remand, it is a defendant's burden to establish jurisdiction by a preponderance of

22  the evidence. *Dart*, 135 S. Ct. at 553-54; *Rodriguez v. AT & T Mobility Servs., LLC*, 728 F.3d 975, 978

23  (9th Cir. 2013).

24          In proving the amount in controversy, "[t]he parties may submit evidence outside the complaint,

25  including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in

4

controversy at the time of removal." *Ibarra v. Manheim Invs, Inc.,* 775 F.3d 1193, 1197 (9th Cir. 2015) (citation and internal quotation marks omitted). The parties submit summary-judgment style evidence and using the preponderance standard "the court decides . . . whether the amount-in-controversy requirement has been satisfied." *Dart,* 135 S. Ct. at 554; *see also Ibarra,* 775 F.3d at 1199-1200. Thus, "'removal . . . is proper on the basis of [an] amount in controversy asserted' by the defendant 'if the district court finds," using the preponderance standard, "that the amount in controversy exceeds' the jurisdictional threshold." *Id.* at 553 (quoting 28 U.S.C. § 1446(c)(2)(B)). When a party relies on a chain of reasoning that includes assumptions, those assumptions must be reasonable. *Ibarra,* 775 F.3d at 1199 (assumptions "cannot be pulled from thin air but need some reasonable ground underlying them"). A defendant cannot establish removal jurisdiction by mere speculation, or prove the requirement on the basis of unreasonable assumptions. *Id.* at 1197.

## IV. DISCUSSION

### A. Timeliness Of Defendant's Removal

A defendant seeking to remove a civil action from state court "shall have 30 days after receipt by or service on that defendant of the initial pleading or summons . . . to file the notice of removal." 28 U.S.C. § 1446(b)(2)(B). If the case is not removable on the basis of the initial pleading, "a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." *Id.* § 1446(b)(3).[1] "Section 1446(b)'s time limit is mandatory such that a timely objection to a late petition will defeat removal." *Kuxhausen v. BMW Fin. Servs. NA LLC,* 707 F.3d 1136, 1142 n.4 (9th Cir. 2013) (internal alterations, quotation marks, and

---

[1] Section 1446 provides that if a defendant removes "under subsection (b)(3) on the basis of jurisdiction conferred by section 1332 more than 1 year after commencement of the action," it may only do so if "the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." *Id.* § 1446(c)(1). This subsection does not apply, however, to class actions. *See* 28 U.S.C. § 1453(b) (providing that removal of class actions to federal district courts are not subject to the one-year limitation in § 1446(c)(1)); *see also Roth v. CHA Hollywood Med. Ctr., L.P.,* 720 F.3d 1121, 1126 (9th Cir. 2013) ("A CAFA case may be removed at any time, provided that neither of the two thirty-day periods under § 1446(b)(1) and (b)(3) has been triggered.").

citation omitted). "A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)." 28 U.S.C. § 1447(c). Defendant removed this case from state court on March 7, 2018, and Plaintiff timely moved to remand on April 6, 2018, within the 30-day window.

### 1. **Removability Of Original Complaint**

Plaintiff argues that Defendant was on notice that the case may have been removable at the time that it received the complaint on April 14, 2017. Mot. at 7. The 30-day period for removal "starts to run from defendant's receipt of the initial pleading only when that pleading affirmatively reveals on its face the facts necessary for federal court jurisdiction." *Harris v. Bankers Life & Cas. Co.*, 425 F.3d 689, 690-91 (9th Cir. 2005) (internal quotation marks and citation omitted). "[A] defendant does not have a duty of inquiry if the initial pleading or other document is 'indeterminate' with respect to removability. Thus, even if a defendant could have discovered grounds for removability through investigation, it does not lose the right to remove because it did not conduct such an investigation and then file a notice of removal within thirty days of receiving the indeterminate document." *Roth*, 720 F.3d at 1125. In other words, "we don't charge defendants with notice of removability until they've received a paper that gives them enough information to remove." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006).

Plaintiff argues that the class defined in the FAC is a subset of the putative class delineated in the initial complaint. The complaint, with its larger class than the one in the amended complaint, would have "led to the same or larger calculations than Defendant uses as a basis for the amount in controversy in its removal." Reply at 7. Therefore, if Defendant is correct that the FAC could properly be removed to federal court, then the initial complaint – representing a more expansive class – must also have been removable, and Defendant missed its opportunity to do so by failing to remove within 30 days of receiving the complaint.

Under CAFA, "defendants need not make extrapolations or engage in guesswork; yet the statute

'requires a defendant to apply a reasonable amount of intelligence in ascertaining removability.'"

*Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1140 (9th Cir. 2013) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 206 (2d Cir. 2001)). "Multiplying figures clearly stated in a complaint is an aspect of that duty." *Id*. The Ninth Circuit has, however, rejected a rule that would require a defendant to rifle through its files to discover whether a complaint is removable when filed. It has instead adopted a bright-line rule limiting the determination of removability to the four corners of the complaint, because "objective analysis of the pleadings brings certainty and predictability to the process and avoids gamesmanship in pleading" and "avoids the spectre of inevitable collateral litigation over whether the pleadings contained a sufficient 'clue,' whether defendant had subjective knowledge, or whether defendant conducted sufficient inquiry." *Harris*, 425 F.3d at 697. Stated simply, the Ninth Circuit has "declined to hold that materials outside the complaint start the thirty-day clock." *Kuxhausen*, 707 F.3d at 1141. A defendant is under no obligation "to supply information which [plaintiff] had omitted." *Id*. (holding that where nothing in the complaint indicated the value of other class members' claims, defendant had no duty to examine its own records to make a determination).

While a defendant is under no duty to investigate facts beyond the four corners of the complaint to determine whether the case might be removable, if a defendant chooses to do so and in the process discovers that the case does meet the threshold requirements for removability, then it *may* remove the case to federal court. *Roth*, 720 F.3d at 1125. The process is not one that it need conduct upon receipt of the complaint. *See Durham*, 445 F.3d at 1251 ("we don't charge defendants with notice of removability until they've received a paper that gives them enough information to remove"). Plaintiff is thus "incorrect in asserting that because [Defendant] *could have* ventured beyond the pleadings to demonstrate removability initially (as it did later upon receipt of the First Amended Complaint) it was therefore *obligated* to do so." *Kuxhausen*, 707 F.3d at 1141 n.3 (emphases in original).

## 2. **"Motions" Or "Other Papers" Triggering Removability**

Plaintiff argues that even if the initial complaint did not put Defendant on notice that the case

was potentially removable, seven separate instances of correspondence, discovery, and briefing should have done so, each of which would have triggered the second 30-day window for removal under 28 U.S.C. § 1446(b)(3), rendering Defendant's removal untimely.

The removal statute provides that if a case is not removable because the initial pleading does not disclose that the amount in controversy exceeds the $75,000 threshold for diversity cases under 28 U.S.C. § 1332(a), "information relating to the amount in controversy in the record of the State proceeding, or in responses to discovery, shall be treated as an 'other paper' under subsection (b)(3)." 28 U.S.C. § 1446(c)(3)(A). Though this provision clarifies that scope of what qualifies as an "other paper" for ordinary diversity actions under § 1332(a), there is no obvious reason why it should not also apply to CAFA cases under § 1332(d), and the Ninth Circuit has treated the state-court record and discovery as "other papers" when determining the amount in controversy for CAFA purposes. *See, e.g.*, *Jordan v. Nationstar Mortg. LLC*, 781 F.3d 1178, 1184 (9th Cir. 2015) (holding that removal was timely when done within 30 days of plaintiff's responses to interrogatories stating that total amount in controversy exceeded $5 million threshold for removal); *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 885, 887 (9th Cir. 2010) (explaining in CAFA action that "a demand letter sent during the course of the state court action can constitute 'other paper' within the meaning of section 1446(b) if it reflects a reasonable estimate of the plaintiff's claim" and that interrogatory responses and deposition testimony can likewise trigger the second 30-day window for removal).

Plaintiff argues that on no fewer than seven separate instances, Defendant was put on notice of the same facts that it later relied on to remove to federal court following the filing of the amended complaint. First, Plaintiff points to an August 21, 2017, letter to Defendant that clarified that Plaintiff sought to represent a different class of employees from the *Hooper* class. Mot. at 11 (citing ECF No. 12-2 at 3 (explaining that *Hooper* covered only those that Defendant classified as "employees")). This letter, Plaintiff claims, alerted Defendant to the identity of the members of the putative class, allowing it to make the arguments in favor of removal at that time. Second, Plaintiff relies on a letter that

Defendant sent to Plaintiff a little over a month later, on September 27, 2017, which memorializes Defendant's understanding that the putative class covers those that Plaintiff believes that URS jointly employed, including parties to independent-contractor agreements or owner-operator agreements. Mot. at 12 (citing ECF No. 12-3). Plaintiff contends that this letter also put Defendant on notice about the scope of the putative class. Third is an email from Plaintiff's counsel to Defendant, dated October 10, 2017, that requested "a ballpark estimate of the class size." Mot. at 12 (quoting ECF No. 12-4 at 6). Fourth is Plaintiff's response to Special Interrogatory No. 1, dated November 1, 2017, which stated Plaintiff's position that "he and other 'drivers of Fleet owners'" were non-exempt employees, contrary to Defendant's classification. Mot. at 12 (quoting ECF No. 12-5 at 4). Fifth is an email dated November 3, 2017, from Defendant to Plaintiff, in which Defendant stated that it was not in possession of any policies or procedures for "drivers of fleet owners that we have been discussing." Mot. at 13 (quoting ECF No. 12-4 at 2.) This, Plaintiff contends, again demonstrates awareness of the class at issue. Sixth is Defendant's motion for judgment on the pleadings, which demonstrated an awareness that the class that Plaintiff sought to represent included drivers of Fleet Owners and was sufficient information to permit Defendant "to calculate the amount in controversy as it ultimately did when it filed its Notice of Removal." Mot. at 13. Seventh, and finally, is Plaintiff's opposition to Defendant's motion for judgment on the pleadings, filed November 20, 2017, which Plaintiff contends included sufficient facts about the scope of the putative class to allow Defendant to make the calculations that it ultimately did when it moved to remove. Plaintiff argues that each of these, covering a period from August 21, 2017, to November 20, 2017, signaled to Defendant that the putative class excluded the *Hooper* class and included Fleet owners, and thus began the 30-day window for removal. Despite this knowledge, "Defendant waited months to remove this matter based on the same facts it ascertained before Plaintiff filed his FAC." Reply at 8.

None of these triggered the 30-day removal window. Plaintiff cites a number of cases for the proposition that disclosures in "other papers" can serve to put a defendant on notice that the

jurisdictional threshold for removal is met and begin the running of the 30-day window for removal. As Defendant correctly points out, however, in each of the cases Plaintiff cites, the "other paper" contained a specific indication that the jurisdictional threshold had been met.[2] Here, even putting aside Defendant's objections to whether the other papers that Plaintiff has identified truly were as illuminating about the nature of Plaintiff's claims as he argues,[3] Plaintiff does not argue that any of the seven examples contains a straightforward declaration about the amount in controversy. *See, e.g.*, Mot. at 14 ("Defendant has been aware that the putative class in this case excluded *Hooper* class members and included drivers of Fleet Owners since at least August 21, 2017 and could have made the same calculations it made in its Notice of Removal at that time."). None of them indicates the number of class members or the potential amount of money at issue; indeed, one of them asks *Defendant* to gather a "ballpark estimate of the class size." A defendant is under no duty of inquiry where a document is indeterminate. *See Roth*, 720 F.3d at 1125 ("even if a defendant could have discovered grounds for removability through investigation, it does not lose the right to remove because it did not conduct such an investigation and then file a notice of removal within thirty days of receiving the indeterminate document"). Under the Ninth Circuit's bright-line rule, without a clearer indication of removability, Defendant was not on notice as to the fact of removability, and the 30-day period did not begin to run.

The Ninth Circuit's opinion in *Carvalho* is instructive. The plaintiff there stated in the complaint that she sought $25,000 in damages, though the complaint was silent as to the damages claimed for the

---

[2] *Babasa v. LensCrafters, Inc.*, 498 F.3d 972, 975 (9th Cir. 2007) (letter sent in anticipation of mediation containing estimate of $9.5 million in unpaid wages and civil penalties was sufficient to trigger 30-day window for removal); *Santos v. SMX, LLC*, No. CV 17-0866 PSG (DTBx), 2017 WL 2825924, at *1 (C.D. Cal. June 29, 2017) (response to request for admission admitting that amount in controversy exceeded $75,000 in non-CAFA action); *Torres v. Util. Tree Serv., Inc.*, No. 16-CV-03424-BLF, 2017 WL 30561, at *1 (N.D. Cal. Jan. 3, 2017) (responses to interrogatories "provid[ing] sufficient information to determine the amount in controversy"). The other two cases in Plaintiff's brief involve federal-question jurisdiction. *Olonzo v. Wells Fargo Bank, N.A.*, No. CV 09-6611 PSG RCX, 2010 WL 330245, at *3 (C.D. Cal. Jan. 21, 2010) (holding that while assertions in case management statement could serve as basis for removal, the assertions did not support a finding of subject matter jurisdiction); *Riggs v. Cont'l Baking Co.*, 678 F. Supp. 236, 238 (N.D. Cal. 1988) (holding that because complaint did not give notice that plaintiff was covered by collective bargaining agreement and plaintiff's deposition was first notice of this fact, removability did not become apparent and clock did not begin running until date of deposition).

[3] Defendant argues, for instance, that it was unclear in Plaintiff's interrogatory responses whether he sought to represent independent third-party entities that contracted with URS ("Fleet Owners") or the drivers of Fleet Owners.

other 500 class members.  Only at her deposition, when she testified that the amount in controversy was at least $25,000 per class member, could the defendant determine that at least $12.5 million was at issue in the aggregate, which was a paper triggering the 30-day removal window.  None of the above instances that Plaintiff identifies comes close to identifying this level of specificity, either as to the number of putative class members or the potential damages at issue, and falls short of putting Defendant on notice that the case was removable.  That Defendant was in possession of facts that did later permit it to conduct its own investigation and perform calculations that served as the basis for its notice of removal does not mean that it was required to do so or that it was required to do so at any particular time.  *Kuxhausen*, 707 F.3d at 1141 n.3.

**B.**     **Whether Defendant Waived Right To Removal**

Plaintiff next argues that Defendant waived the right to removal by moving for judgment on the pleadings, an affirmative act seeking a dispositive ruling that manifested an intent to submit to having the matter adjudicated in the state forum.  A defendant "may waive the right to remove to federal court where, *after it is apparent that the case is removable*, the defendant takes actions in state court that manifest his or her intent to have the matter adjudicated there, and to abandon his or her right to a federal forum."  *Kenny v. Wal-Mart Stores, Inc.*, 881 F.3d 786, 790 (9th Cir. 2018) (internal quotation marks and citation omitted) (emphasis supplied).  Any such waiver "must be clear and unequivocal."  *Id*. Where a party takes "necessary defensive action to avoid a judgment being entered automatically against him, such an action does not manifest an intent to litigate in state court."  *Resolution Tr. Corp. v. Bayside Developers*, 43 F.3d 1230, 1240 (9th Cir. 1994), *as amended* (Jan. 20, 1995).  "In general, the right of removal is not lost by action in the state court short of proceeding to an adjudication on the merits."  *Id*. (internal quotation marks and citation omitted).  In *Kenny*, a defendant in a class action filed a demurrer and motion to strike on the deadline for responding to the complaint.  After filing the demurrer, and before the plaintiff had filed an opposition to the motion, the defendant removed to federal court under CAFA.  Because the complaint was indeterminate as to removability, and the

defendant discovered grounds for removal only through its own investigation, the Ninth Circuit held that the defendant had not waived its right to remove by participating in state court litigation prior to removing the case. 881 F.3d at 790-91.

Plaintiff's argument fails for the same reason that the "other papers" did not trigger removability. Because it was not apparent from the pleadings or other papers that the case was removable, Defendant did not consent to jurisdiction by filing a motion for judgment on the pleadings. Courts "will not charge defendants with notice of removability until they have received a paper that gives them enough information to remove," and "[a]s long as the complaint or an amended pleading, motion, order or other paper does not reveal that the case is removable, a defendant, in effect, may remove at any time." *Kenny*, 881 F.3d at 791 (quoting *Kuxhausen*, F.3d at 1141, and *Rea*, 742 F.3d at 1238) (internal alterations omitted). Here, without having received a complaint or other papers making it apparent that the case was removable, Defendant conducted its own investigation, determined that the case was removable, and removed to federal court. Without having previously been on notice that the case was removable, Defendant was not required to remove, and litigating in state court until it was on notice of the cases' removability did not waive Defendant's right to remove. *See id.* at 791 ("In short, a CAFA case may be removed at any time, provided that neither of the two thirty-day periods under 28 U.S.C. § 1446(b)(1) and (b)(3) has been triggered.") (internal quotation marks, citation, and alterations omitted). A defendant's litigating in state court prior to discovery that a case is removable does not manifest an intent to litigate there or "affirmatively 'abandon its right to a federal forum.'" *Id*. at 791-92 (quoting *Resolution Tr.*, 43 F.3d at 1240).

## C. Whether Defendant Met Its Burden Of Proof To Demonstrate Amount In Controversy

Federal district courts have original jurisdiction over class actions under CAFA when there are at least 100 class members, there is minimal diversity, and there is more than $5 million in controversy, excluding interest and costs. *Ibarra*, 775 F.3d at 1195 (citing 28 U.S.C. § 1332(d)). Plaintiff does not contest that there is minimal diversity between the parties but argues that Defendant has not met its

burden to demonstrate jurisdiction on the other two requirements for federal jurisdiction under CAFA.[4]

Where a complaint is silent on damages or where a defendant believes that the complaint understates damages, the removing defendant bears the burden of demonstrating the amount in controversy by a preponderance of the evidence. *Ibarra*, 775 F.3d at 1197; *Rea v. Michaels Stores Inc.*, 742 F.3d 1234, 1239 (9th Cir. 2014). Defendant has attempted to meet that burden here by introducing testimony from Eric Madison, Vice President of Human Resources for URS, in the form of two affidavits. The first, submitted with the Defendant's Notice of Removal, states the grounds for his calculations demonstrating an estimated amount in controversy of just over $5.1 million, exclusive of potential attorneys' fees. ECF No. 1-2 ("Madison Decl."). The second, submitted with Defendant's opposition to Plaintiff's motion to remand, attempts to respond to some of the arguments Plaintiff raised in the motion to remand and further explain the basis for some of the calculations. ECF No. 13-1 ("Madison Suppl. Decl.").[5]

Plaintiff's suit claims violations for wage theft/time shaving, failure to pay overtime, failure to provide meal periods, failure to authorize and permit rest periods, knowing and intentional failure to comply with itemized employee wage statement provision, failure to pay all wages due at time of termination, failure to reimburse/illegal deductions, and violation of the Unfair Competition Law. Based on the Madison Declarations, Defendant estimates that there are between 160 and 182 putative class members. It does not have exact data for the hourly rate of pay for the class members or number of work weeks they worked but provided estimates for these figures in the Madison Declarations. Based on those declarations, they estimate the potential economic damages as follows.

---

[4] Plaintiff has not contested Defendant's evidence that it is incorporated in Delaware and has its principal place of business in Romulus, Michigan. Madison Decl. ¶¶ 2-3. Plaintiff is a resident of California. FAC ¶ 27.

[5] "Under Ninth Circuit law, it is permissible for a party to supplement the allegations in a notice of removal by submitting evidence in opposition to a motion to remand." *Dejong v. Prod. Assocs., Inc.*, No. CV 14-02357 MMM DTBX, 2015 WL 1285282, at *9 (C.D. Cal. Mar. 19, 2015) (citing *Gen. Dentistry For Kids, LLC v. Kool Smiles, P.C.*, 379 F. App'x 634, 636 (9th Cir. 2010) ("a district court may consider later-provided evidence as amending a defendant's notice of removal")); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 n.1 (9th Cir. 2002).

For the failure to pay straight time wages, the Complaint alleges that Defendant had a "continuous and consistent policy of clocking-out Plaintiff and those similarly situated for a thirty (30) minute meal period, even though Plaintiff and all members of the Class work through their meal periods." ECF No. 1-1, Amended Complaint ¶ 94. Defendant assumed that though this claim also alleges a failure to pay putative class members for time worked before clocking in and after clocking out, it would assume only a daily failure to pay for a 30-minute meal period. It estimates the amount in controversy for this claim to be $605,002.80 ($25.24 per hour x 0.5 hours of time per day x 5 occurrences per week x 9,588 total work weeks in the four-year relevant time period). ECF No. 1, Notice of Removal ¶ 21(b).

For the failure to pay overtime, the Amended Complaint again alleges a "continuous policy" of failure to pay overtime to Plaintiff and others working over eight hours per day and 40 hours per week. Assuming 2.5 hours of unpaid overtime per week, Defendant calculates the amount in controversy for this claim to be $907,504.20 ($25.24 x 1.5 overtime rate x. 2.5 hours overtime per week x 9,588 total work weeks in the four-year relevant time period). ECF No. 1, Notice of Removal ¶ 21(c).

For the failure to provide meal periods, the Amended Complaint alleges a "pattern and practice" of failure to provide 30-minute meal periods for those working more than five consecutive hours and failure to provide a second 30-minute meal period on days where a driver worked more than 10 hours. Amended Complaint ¶¶ 112, 114, 117. Plaintiff seeks one hour of compensation for each work day in which a 30-minute meal period was not provided. *Id.* ¶ 113. Defendant assumes that each putative class member was deprived of one 30-minute meal per day five days per week and calculates the amount in controversy for this claim to be $1,210,005.60 ($25.24 per hour x 1 hour of regular compensation as a penalty for each non-compliant meal period x 5 violations per week x 9,588 work weeks in the four-year relevant time period). ECF No. 1, Notice of Removal ¶ 21(d).

Plaintiff alleges that Defendant failed to authorize and permit the required 10-minute rest period for every four hours worked. Amended Complaint ¶¶ 132-142. He seeks one hour of pay for each

workday that the period is not provided.  *Id*. ¶ 133.  Defendant assumes that each putative class member was deprived of one 10-minute rest period per day five days per week and calculates the amount in controversy for this claim to be $1,210,005.60 ($25.24 per hour x 1 hour of regular compensation as a penalty for the failure to provide a rest period x 5 violations per week x 9,588 work weeks in the four-year relevant time period).  ECF No. 1, Notice of Removal ¶ 21(e).

Plaintiff alleges that Defendant failed to provide putative class members with complete and accurate wage statements under California Labor Code § 226(a).  This provides a maximum aggregate penalty of $4000 per person and has a one-year statute of limitations.  Defendant calculates the amount in controversy for this claim to be $500,000, which it calculated by estimating that 125 drivers worked within the one-year statute of limitations and that each was subject to the $4000 penalty.   ECF No. 1, Notice of Removal ¶ 21(f).

Finally, Plaintiff alleges that Defendant willfully failed to pay all wages due at the time of termination of employment.  Claims under California Labor Code § 203 provide for the payment of all daily wages for which a former employee was not paid, at the hourly rate, for up to thirty days, and carries a three-year statute of limitations.  With an estimated 124 drivers working within the three-year period, Defendant estimates that the amount in controversy for this claim is $751,440 ($25.24 per hour x 8 hours x 30 days x 124 drivers).  ECF No. 1, Notice of Removal ¶ 21(g).

Defendant estimates that the total amount in controversy for these claims "is, conservatively estimated, at least $5,183,958.20."  ECF No. 1, Notice of Removal ¶ 22.

Plaintiff objects to the class size, number of work weeks, calculation of amount in controversy for the wage statement claim, hourly rate used for the calculations, and the addition of potential prospective attorneys' fees.

### 1.  Class Size

Plaintiff first argues that Defendant's estimate of the number of class members is speculative and unsupported, because the Madison declaration states that "there are 182 drivers who may fall within the

class Plaintiff seeks to represent" and that, accounting for the potential duplicates due to minor variations in drivers' names in their records, "there are still at least 160 unique individuals who may fall within the class definition." Madison Decl. ¶ 4. Plaintiff argues that the use of the word "may," coupled with a lack of specificity with respect to the exact files consulted to produce the estimate, renders the testimony speculative and falls short of meeting the evidentiary burden. Madison's supplemental declaration clarifies that he reviewed "the available records for drivers of Fleet Owners, which contains the name of the driver, the fleet he or she drove for, and the date range that the driver drove for the Fleet Owner (with respect to URS pickups or deliveries)," then counted the drivers listed on these records to determine that there are between 160 and 182 people in that group during the relevant timeframe. Madison Suppl. Decl. ¶¶ 6-7. He testifies that he used the word "may" not to express uncertainty but to leave room for small modifications attributable to "slight name variances." *Id*. ¶ 6. Plaintiff finds the supplemental declaration continuing to lack in specificity about the exact records consulted.

Madison's "personal knowledge of the business records to which he has access as part of his duties as Vice President of Human Resources for Defendant provides a sufficient foundation" for his testimony that the class consists of between 160 and 182 drivers. *Hernandez v. Nuco2 Mgmt., LLC*, No. 1:17-CV-01645-LJO-JLT, 2018 WL 933506, at *5 (E.D. Cal. Feb. 16, 2018); *see also Lewis v. Verizon Comm'ns, Inc.*, 627 F.3d 395, 397 (9th Cir. 2010) ("To satisfy its burden in this case, the removing defendant . . . supplied an affidavit to show that the potential damages could exceed the jurisdictional amount. We conclude that this showing satisfies [defendant's] burden.").

The Court finds that Defendant has met its burden to show by a preponderance of the evidence that the class consists of 100 or more people and that its estimate of the number of drivers is reasonable and supported.

**2.** **Number Of Work Weeks**

Plaintiff next argues that Madison's testimony that during the period from February 1, 2013, through March 1, 2018, "these drivers drove a total of approximately 9,588 work weeks," Madison Decl.

¶ 6, is also unsupported.  In his supplemental declaration, Madison explains that for each driver, he examined the document containing the names, Fleet Owner for which the driver drove, and the date range that the driver worked, calculated the number of days a driver drove for a Fleet Owner (the difference between the date the driver began driving and the last date on which the driver worked), then divided the number of days by seven to get the approximate number of weeks each driver drove for the Fleet Owner.  Madison Suppl. Decl. ¶¶ 9-10.  In other words, he approximated the number of weeks that elapsed between a driver's first day and last day and assumed that each of them worked during each week in between.  A defendant need not "research, state, and prove the plaintiff's claims for damages," *Coleman v. Estes Express Lines, Inc.*, 730 F. Supp. 2d 1141, 1147–48 (C.D. Cal. 2010), but a defendant does need to come forward with reasonable and supported calculations of the amount in controversy. Madison's estimate of the number of work weeks at issue accounts for no vacation time or other time off that a driver may take over the course of the five years at issue here and fails to explain why the estimate does not account for the actual percentage of work weeks that an average driver can reasonably be expected to work during his or her time driving for Fleet Owners.  It instead assumes that every driver worked a full work week during the entire term of their driving for the Fleet Owners.  The Court does not find it reasonable to assume that every driver worked every possible week during the entirety of the class period.  Without any information about why this is a reasonable assumption, the Court is not persuaded that it is proper to assume that *any* class member worked every possible week during the period at issue and cannot accept for purposes of calculating the amount in controversy that this is a reasonable assumption for *every* class member.

    That the calculations supporting the amount in controversy are anchored to a number of work weeks that accounts for no vacation time or other time off for any putative class member over the course of the five years at issue, without explanation for how much time off each driver might be expected to take or why it did not account for the actual percentage of work weeks that a driver might reasonably be expected to work, leaves the Court unable to assess the reasonableness of the calculations using this

number.  *Cf. Hernandez*, 2018 WL 933506, at *5 (crediting declaration from defendant's employee, finding that the "workweek calculation accounting for sick and/or vacation time generates a more reasonable and specific estimate than calculating the workweeks solely based on each class member's dates of employment").

### 3.    Calculation Of Amount In Controversy For Wage Statement Claim

Plaintiff argues that Defendant's calculation of the amount in controversy for the wage statement claim is speculative because the calculation assumed that each of the 125 drivers who drove for fleets within the one-year period prior to the filing of the Complaint would be subject to the maximum statutory penalty of $4000.  He objects on two grounds.  First, he argues that Defendant provided no evidence that all of the 125 drivers worked every pay period.  Second, he contends that Defendant provided no evidence about the frequency with which drivers were paid.  California Labor Code § 226 provides for damages up to $50 for the initial pay period and up to $100 for each subsequent violation per pay period per employee.  Cal. Labor Code § 226(e)(1).  If drivers were paid biweekly, rather than weekly, as Defendant assumed when calculating the amount in controversy for this claim, then the amount at issue would be reduced substantially, from Defendant's estimate of $500,000 to approximately $318,750.[6]  In opposition, Defendant points to Plaintiff's testimony that he received paychecks on a weekly basis as support for its assumption of a weekly pay period.  Opp. at 17-18; ECF No. 13-2.  It also calculated the number of weeks that class members worked in the last year and determined that a more accurate estimate of the total amount in controversy for this claim was $423,650.  Madison Suppl. Decl. ¶¶ 12-14.  For purposes of this motion, the Court assumes that $423,650 is the appropriate figure.

### 4.    Hourly Rate Used To Calculate Amount In Controversy

Plaintiff objects that the hourly rate Defendant used to calculate the amount in controversy is

---

[6] Assuming biweekly payments, there would be 26 pay periods in a year.  The initial violation, with a $50 penalty, for 125 drivers would amount to $6250.  The subsequent 25 violations, at $100 per violation for 125 drivers, would total $312,500.

18

unsupported and speculative.  Madison states in his declaration, "I understand that Plaintiff alleges in this case that he is, was, or should be considered a URS employee. Based on this allegation, and without conceding its truth, URS pays its actual employee drivers an average of approximately $25.24 an hour (before any bonuses)."  This $25.24 figure serves as the basis for nearly all of Defendant's calculations to demonstrate that the amount is at issue exceeds the $5 million jurisdictional threshold.  Madison does not explain what records he examined to come to this conclusion.  Nor does he explain whether the "employee drivers" differ in kind, such as in level of experience, or in pay from drivers who did not contract directly with URS.  Importantly, the figure he offers appears to be the average hourly wage the company *currently* pays its drivers.  The declarations do not even attempt to establish what Defendant paid its drivers—to say nothing of what any drivers working through Fleet Owners were paid—in 2017, 2016, 2015, 2014, or 2013.  Defendant offers nothing to support the idea that this was the average rate paid to the class of drivers Plaintiff seeks to represent beginning *more than five years ago*.

Plaintiff demonstrates the importance of the hourly wage by performing the same calculations that Defendant did in the notice of removal, but with an hourly rate of $24, rather than $25.24.  Even holding constant all other assumptions that Defendant used when performing the calculations, Plaintiff's calculations show that using an hourly rate of $24 would drop the calculations below the $5 million threshold.  The Court also ran the calculations using hourly rates of $22 or $20 for further points of reference:

- **Straight Time Wages**: (hourly rate) x 0.5 hours per day x 5 days per week x 9588 work weeks
  - $25.24: $605,002.80
  - $24: $575,280
  - $22: $527,340
  - $20: $479,400
- **Overtime**: (hourly rate) x 1.5 overtime rate x 2.5 hours per week x 9588 work weeks
  - $25.24: $907,504.20

1

           o   $24: $862,920

2

           o   $22: $791,010

3

           o   $20: $719,100

4

- **Meal Periods**: (hourly rate) x 1 hour per day x 5 days per week x 9588 work weeks

5

           o   $25.24: $1,210,005.60

6

           o   $24: $1,150,560

7

           o   $22: $1,054,680

8

           o   $20: $958,800

9

- **Rest Periods**: (hourly rate) x 1 hour per day x 5 days per week x 9588 work weeks

10

           o   $25.24: $1,210,005.60

11

           o   $24: $1,150,560

12

           o   $22: $1,054,680

13

           o   $20: $958,800

14

- **Wage Statement**: $423,650[7]

15

- **Waiting Time Penalties**: (hourly rate) x 8 hours x 30 days x 124 drivers

16

           o   $25.24: $751,440

17

           o   $24: $714,240

18

           o   $22: $654,720

19

           o   $20: $595,200

20

- **Total**:

21

           o   $25.24: $5,107,608.20

22

           o   $24: $4,877,210

23

           o   $22: $4,577,990

24

  ———————————————

25

[7] This figure is taken from the Opposition. The notice of removal initially calculated the potential damages as $500,000. Plaintiff's Motion claimed that the figure could be as low as $318,750.

o $20: \$4,134,950

"[T]he average wage of class members during the relevant period is an acceptable method on which to base the amount-in-controversy calculation." *Hernandez*, 2018 WL 933506, at *5. While "it is preferable for defendants to calculate the average hourly wage based on the average wage of all class members," it is often "unworkable at [an early] stage of the litigation to require defendants to determine the actual individual members of the entire class." *Helm v. Alderwoods Grp., Inc.*, No. C 08-01184SI, 2008 WL 2002511, at *4 n.3 (N.D. Cal. May 7, 2008) (permitting defendant to rely on the average hourly wage of the 27 named plaintiffs to do calculations of amount in controversy but cautioning that "[i]t would not necessarily be an appropriate substitute, however, if the average were based on the salaries of only a few named plaintiffs"); *see also Coleman*, 730 F. Supp. 2d at 1150 (relying on average salaries when performing calculations and noting that even if the putative class members were only paid minimum wage, the amount in controversy would exceed CAFA's jurisdictional threshold). Plaintiff does not argue that class member's average wage can never serve as the basis for the calculation of the amount in controversy but contends that the $25.24 figure is speculative without any way to connect it to the actual wages class members earned.

Defendant argues in response that Plaintiff does not contest that $25.24 is the average hourly rate of URS employees. It is not clear why he would, when his better argument is that Defendant has not provided a foundation for the idea that this rate is the one applicable to the class of drivers he seeks to represent. Defendant concedes Plaintiff's point when it "openly admits that it does not know how much drivers of Fleet Owners are paid on an hourly basis." Opp. at 18. It argues that the average rate that Defendant currently pays its drivers is a "good faith and reasonable" number to anchor the calculations. *Id*. Plaintiff responds that if Defendant has enough information to determine the number of class members and the number of work weeks they worked during the class period, it is likely the Defendant "can access some information to support how much they were paid." Reply at 3.

Plaintiff further argues that Defendant has not put forward sufficient evidence to establish how

class members were paid. The Complaint alleges that Plaintiff and other putative class members were employed on a "piece-rate basis within California."[8] Complaint ¶ 57. Defendant has not explained the relevance of the hourly rate that Defendant currently pays its employee drivers to the wages paid to drivers for Fleet Owners paid under a system of piece-meal compensation.

The declarations do not establish by a preponderance of the evidence that workers driving for Fleet Owners are paid $25.24 per hour today, and they fall far short of establishing that $25.24 is an appropriate figure from which to calculate the potential damages for the entire span of the class period. Defendant admits that it does not know what the class members were paid on an hourly basis, and it has not provided sufficient support for the figure it did choose. As demonstrated above, the hourly wage substantially affects the amount in controversy calculation. If the number of work weeks is less than 9588—which it more than likely is, given that that number represents the unrealistic scenario in which class members drove every possible week—then the calculations would result in additionally reduced figures. Depending on the appropriate average hourly wage and number of work weeks at issue, even holding the other assumptions constant, the calculations that Defendant performed to demonstrate the amount in controversy could well fall below $5 million or $4 million. Without more information, the Court cannot make that determination.

In short, Defendant has offered little to support the rate it has chosen to serve as the anchor of its calculations supporting its contention that the amount in controversy exceeds the jurisdictional threshold. A good-faith estimate relying on supported, reasonable assumptions can serve to meet the burden for removal. However, "a defendant must set forth the underlying facts supporting its assertion that the amount in controversy exceeds the statutory minimum." *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008) (citing *Gaus v. Miles*, Inc., 980 F.2d 564, 567 (9th Cir. 1992)). Defendant has not done so here.

---

[8] "Piece-rate compensation involves a method of calculating compensation based on the type and number of tasks completed, rather than by the number of hours worked." *Ontiveros v. Safelite Fulfillment, Inc.*, 231 F. Supp. 3d 531, 536 (C.D. Cal. 2017) (internal quotation marks and citation omitted).

**5.    Calculation Of Attorneys' Fees**

The Ninth Circuit has held that for purposes of determining subject-matter jurisdiction, "attorneys' fees can be taken into account in determining the amount in controversy if a statute authorizes fees to a successful litigant." *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1155 (9th Cir. 1998) (internal quotation marks and citation omitted).  The Ninth Circuit has not determined how to measure those fees for removal purposes, and "[i]t remains an open question whether attorney's fees that are anticipated but unaccrued at the time of removal or filing in federal court, such as those at issue in this case, may be included in the amount-in-controversy." *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 649 n.2 (9th Cir. 2016) (declining in diversity case to "resolve this open question" because the jurisdictional threshold was met before any attorneys' fees were included) (citing *Gardynski–Leschuck v. Ford Motor Co*., 142 F.3d 955, 958 (7th Cir. 1998) (rejecting inclusion of anticipated but unaccrued fees that "have not been and may never be incurred"), *Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1340 (10th Cir. 1998) (including "a reasonable attorney's fee" in calculation of amount in controversy)); *see also Victoria E. Lucas v. Michael Kors (USA), Inc.*, No. CV 18-1608 MWF (MRWx), 2018 WL 2146403, at *12 (C.D. Cal. May 9, 2018) (collecting district-court cases applying 25% benchmark to calculate attorneys' fees for determination of amount in controversy in CAFA wage-and-hour cases but declining to reach issue); *Perez Reyes v. Nat'l Distribution Centers,* LLC, No. EDCV 17-2434 JGB (SPx), 2018 WL 679451, at *5 (C.D. Cal. Feb. 1, 2018) (holding in wage-and-hour case under CAFA that "when calculating attorneys' fees to establish jurisdiction, the only fees that can be considered are those incurred as of the date of removal") (internal quotation marks and citation omitted); *Carranza v. Nordstrom, Inc.*, No. EDCV 14-01699 MMM (DTBx), 2014 WL 10537816, at *17 n.99 (C.D. Cal. Dec. 12, 2014) (in CAFA wage-and-hour case, collecting district-court cases and holding that "only attorneys' fees that have accrued as of the date of removal may be considered in determining whether the jurisdictional amount is at stake").

Defendant argues that courts routinely add prospective but unaccrued attorneys' fees to calculate

the amount in controversy under CAFA and distinguish the cases Plaintiff cites where courts decline to do so as instances of defendants' attempts to use attorneys' fees to bootstrap diversity cases with "a nominal damages claim" into federal court. Opp. at 20. Courts in CAFA wage-and-hour cases also routinely decline to add prospective attorneys' fees to the amount in controversy, and there remains a split within this Circuit on the issue. *See Perez Reyes*, 2018 WL 679451, at *5.

Defendant's notice of removal points to the attorneys' fees awarded in a "similar employment case" bringing allegations similar to the ones here brought by the same counsel representing Plaintiff here. In that case, counsel sought fees in the amount of $375,000. ECF No. 1 ¶ 26. The notice of removal contended that because the amount in controversy based on the non-attorneys' fees calculations were over the $5 million jurisdictional threshold, the $375,000 in potential attorneys' fees–which could be even higher in a case proceeding to trial rather than settling–increased the amount in controversy even further beyond the jurisdictional requirement. *Id.* ¶¶ 27-28.

That argument assumed the propriety of using $25.24 as the proper average hourly wage and that the other assumptions in the calculations performed in connection with the notice of removal were correct. If $375,000 in attorneys' fees were added to the amounts calculated using a $22 hourly wage, even holding all other assumptions constant, the total would not exceed the $5 million threshold. Defendant argues in opposition to Plaintiff's motion to remand that its fee estimate "is even more conservative than warranted" given that courts, including this one,[9] generally use a 25% benchmark to calculate potential attorneys' fees in calculating the amount in controversy in CAFA cases.

The Court need not reach the issue of how attorneys' fees apply in CAFA cases such as this one. Defendant has not established by a preponderance of the evidence that the underlying amount in

---

[9] Defendant cites *Hernandez*, 2018 WL 933506 (E.D. Cal. Feb. 16, 2018), in support of this statement. This Court in *Hernandez* did not hold that unaccrued attorneys' fees were properly included when determining the amount in controversy under CAFA; the Court included 25% of the potential claimed economic damages to demonstrate that the defendant there fell short of establishing by a preponderance of the evidence that at least $5 million was in controversy, even assuming that all of the defendant's calculations and assumptions were correct. *See id.* at *8 ("Even assuming (as set out below) Defendant's calculations for each of the remaining claims, including those for minimum wage/liquidated damages and attorney's fees, are reasonable and supported, the total in controversy remains far below the $5 million threshold.").

24

controversy on which any 25% fee would be based is at least $4 million is in controversy. *See Jian-Ming Zhao v. RelayRides, Inc.*, No. 17-CV-04099-JCS, 2017 WL 6336082, at *16 (N.D. Cal. Dec. 12, 2017) ("Because Defendants have not met their burden as to those underlying losses, the Court also concludes that their estimate of attorneys' fees is speculative."); *Gaasterland v. Ameriprise Fin. Servs., Inc.*, No. 16-CV-03367-LHK, 2016 WL 4917018, at *10 (N.D. Cal. Sept. 15, 2016) ("Indeed, even in those cases where courts have considered future attorney's fees in determining the amount in controversy, these courts have required defendants to provide a reasonably specific showing as to why a certain fee award is appropriate."); *see also Carranza*, 2014 WL 10537816, at *17 n.99 ("Thus, even if the court were to credit the remainder of Nordstrom's unsupported assumptions, it would find Nordstrom's estimate of attorneys' fees speculative inasmuch as it is not supported by summary-judgment type evidence concerning the fees incurred as of the date of removal.").

Because the Court finds that Defendant has not established by a preponderance of the evidence that the underlying amount in controversy on which any 25% fee would be based is at least $4 million, it need not determine (1) whether unaccrued attorneys' fees may be considered for jurisdictional purposes or (2) whether Defendant's estimate of the potential attorneys' fees here is supported by a preponderance of the evidence. *See Garibay v. Archstone Communities LLC*, 539 F. App'x 763, 764 (9th Cir. 2013) (affirming order remanding case in wage-and-hour action removed pursuant to CAFA where "defendants rely on speculative and self-serving assumptions about key unknown variables"); *Rutledge v. Healthport Techs., LLC*, No. 16-CV-06920-VC, 2017 WL 728375, at *2 (N.D. Cal. Feb. 24, 2017) ("Even if it is appropriate to assume that the attorneys' fees will be a percentage of the projected damages in this case, the underlying damages calculation is based on unsupported assumptions."); *Jian-Ming Zhao v. RelayRides, Inc.*, No. 17-CV-04099-JCS, 2017 WL 6336082, at *16 (N.D. Cal. Dec. 12, 2017) ("Because Defendants have not met their burden as to those underlying losses, the Court also concludes that their estimate of attorneys' fees is speculative."); *Gaasterland v. Ameriprise Fin. Servs., Inc.*, No. 16-CV-03367-LHK, 2016 WL 4917018, at *10 (N.D. Cal. Sept. 15, 2016) ("Indeed, even in

25

those cases where courts have considered future attorney's fees in determining the amount in controversy, these courts have required defendants to provide a reasonably specific showing as to why a certain fee award is appropriate."); *Carranza*, 2014 WL 10537816, at *17 n.99 ("Thus, even if the court were to credit the remainder of Nordstrom's unsupported assumptions, it would find Nordstrom's estimate of attorneys' fees speculative inasmuch as it is not supported by summary-judgment type evidence concerning the fees incurred as of the date of removal.").

**D.** <u>**Attorneys' Fees And Costs**</u>

Plaintiff moves for the costs and attorneys' fees incurred in preparing the motion, in the amount of $8865. Mot. at 23; ECF No. 12-6 ¶ 3. A court remanding a case to state court has discretion to order the defendant to pay the plaintiff's costs and fees. 28 U.S.C. § 1447(c) ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."). "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). If the court finds that there is an objectively reasonable basis, the court should deny a request for fees. *Id.*

Defendant had an objectively reasonable basis for removal. The Court agrees that none of the seven triggering events that Plaintiff cites did in fact start the 30-day clock to remove. In addition, Defendant is correct that if it can demonstrate by a preponderance of the evidence that more than $5 million is in controversy, then it could establish federal jurisdiction under CAFA, and it did put forward appropriate evidence in support of removal. That Defendant failed to carry its burden here does not mean that it lacked an objectively reasonable basis to remove. *See Gardner v. UICI*, 508 F.3d 559, 562 (9th Cir. 2007) ("Under *Martin*, however, whether a removal is improper is not dispositive in determining whether fees should be awarded under 28 U.S.C. § 1447(c)."); *see also Martin,* 546 U.S. at 140 ("[T]here is no reason to suppose Congress meant to confer a right to remove, while at the same time discouraging its exercise in all but obvious cases."). The Court finds that even though it did not

meet its burden, Defendant's removal was not objectively unreasonable and that the parties therefore should bear their own costs and fees.

Accordingly, Plaintiff's request for costs and fees is **DENIED**.

### V. <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.  Plaintiff's motion to remand is **GRANTED**;

2.  Plaintiff's request for attorneys' fees and costs is **DENIED**;

3.  The Clerk of this Court is **DIRECTED** to serve a copy of this order on the Kern County Superior Court;

4.  The Clerk of this Court is **DIRECTED** to close this case, as the matter has been remanded and is returned to the jurisdiction of the Kern County Superior Court.

IT IS SO ORDERED.

Dated:   **May 25, 2018**                     **/s/ Lawrence J. O'Neill**
                                                    UNITED STATES CHIEF DISTRICT JUDGE